UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLENN KRASNER,

                        Plaintiff,

         - against -

THE CITY OF NEW YORK, and
THE FIRE DEPARTMENT OF THE CITY
OF NEW YORK,

                      Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 23. 2013

**MEMORANDUM
OPINION & ORDER**

11 Civ. 2048 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       Plaintiff Glenn Krasner alleges that Defendants the City of New York and the Fire Department of the City of New York ("FDNY") discriminated against him because he suffers from Asperger's syndrome, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the New York State Human Rights Law ("NYSHRL"), Executive Law § 296 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 et seq.  The Complaint also alleges that Defendants retaliated against him after he filed a complaint with the FDNY Office of Equal Employment Opportunity and because he sought a reasonable accommodation.

       Krasner moved for summary judgment on September 12, 2012, and Defendants cross-moved for summary judgment on September 24, 2012.  For the reasons stated below, Krasner's motion will be denied and Defendants' motion will be granted.

<u>BACKGROUND</u>

I.      <u>FACTS AND PROCEDURAL HISTORY</u>

      A.      <u>The Parties</u>

            On June 29, 1992, Krasner was provisionally appointed a Fire Protection

Inspector ("FPI") with of the FDNY.  (Def. R. 56.1 Stmt. ¶ 3)[1]  Plaintiff received a permanent

appointment as an FPI on December 9, 1996, after passing the civil service examination.  (Def.

R. 56.1 Stmt. ¶¶ 2, 4)  FPI's inspect premises and businesses to ensure that they are in

compliance with FDNY codes and regulations.  (Def. R. 56.1 Stmt. ¶ 5)  Plaintiff received six

weeks of training, during which he was instructed on the relevant codes and regulations, how to

perform inspections, and how to properly complete required paperwork.  (Def. R. 56.1 Stmt. ¶¶

6-7)  Plaintiff was assigned to work at District Office 1, located at 9 Metrotech Center, Brooklyn,

New York – the same building that houses the FDNY executive offices.  (Def. R. 56.1 Stmt. ¶

12)  In 2006, Plaintiff was honored as Fire Inspector of the Year by the FDNY.  (Pltf. R. 56.1

Stmt. ¶ 10)

      B.      <u>Krasner's Disciplinary History</u>

            On April 4, 1997, Plaintiff was served with a disciplinary charge alleging that he

had been disrespectful to a co-worker on January 2, 1997.  (Def. R. 56.1 Stmt. ¶13)  Plaintiff had

said to a co-worker, "[c]an I fuck you in the ass?"  (Def. R. 56.1 Stmt. ¶ 14)  As a result of this

incident, Plaintiff agreed to accept a formal letter of reprimand, in lieu of a formal evidentiary

---

[1]  To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  <u>See Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

hearing before an Administrative Law Judge (ALJ) of the City's Office of Administrative Trials and Hearings ("OATH").[2]  (Def. R. 56.1 Stmt. ¶ 15)

In 2003, Plaintiff was again disciplined for using inappropriate language to a co-worker.  (Def. R. 56.1 Stmt. ¶ 16)  Plaintiff told a co-worker, "[s]uck my dick."  (Def. R. 56.1 Stmt. ¶17)  On May 5, 2003, Plaintiff signed a Stipulation and Agreement accepting a formal reprimand.  (Def. R. 56.1 Stmt. ¶ 18)

On August 12, 2004, during a meeting of the District Office, Plaintiff was disorderly and disruptive.  (Def. R. 56.1 Stmt. ¶ 19)  According to Plaintiff, at this meeting he "screamed at the top of [his] voice with profanity and total disrespect so loud that it was almost deafening."  (Def. R. 56.1 Stmt. ¶ 20)  He was issued a disciplinary memorandum in connection with this incident.  (Collyer Decl., Ex. I)

On February 14, 2006, Plaintiff was charged with violating the FDNY's Civilian Code of Conduct.  (Def. R. 56.1 Stmt. ¶ 21)  The charge alleged that Plaintiff "was given a verbal instruction . . . by two different supervisors to serve an outstanding repeat violation and Mr. Krasner refused to do [so].  In refusing to do as instructed, Mr. Krasner stated in a very loud voice that he would not serve the violation and used profane language."  (Def. R. 56.1 Stmt. ¶ 21; Collyer Decl., Ex. J at BITS0007-BITS0010)

On February 16, 2006, Plaintiff was again charged with violating the Code of Conduct.  (Def. R. 56.1 Stmt. ¶ 21)  The charging documents state:  "[Plaintiff] stated aloud in sum and substance:  **That son of a bitch was trying to get me to serve a violation.**  When Mr. Krasner was instructed by a supervisor to cease from yelling and using profanity, he then loudly stated in sum and substance to said supervisor:  **I'm going to get the birdshot and get you.**

---

[2]  OATH is a City agency that, <u>inter alia</u>, conducts hearings to resolve disciplinary charges brought against City civil service employees.  (Def. R. 56.1 Stmt. ¶ 12)

**You're both getting up my ass.**"  (Def. R. 56.1 Stmt. ¶ 21; Collyer Decl., Ex. J at BITS0011-

BITS0013) (emphasis in original).  The charging documents also state that on the same day,

"after [Krasner] was instructed by his supervisor to make a revision on a document[,] he struck

said supervisor's chest three time[s] with his own chest while yelling in sum and substance:  **I'll**

**fuck you up; I'll fuck you up**.  When another supervisor attempted to intervene and instructed

Mr. Krasner to cease his conduct, Mr. Krasner then proceeded to yell in sum and substance:  **I'm**

**going to fuck you both up; I'm going to kill you both**."  (Def. R. 56.1 Stmt. ¶21; Collyer

Decl., Ex. J. at BITS0014-BITS0016) (emphasis in original).

On April 17, 2007, Cho Seung-Hui shot and killed 32 people and wounded others

on the campus of Virgina Tech.  (Def. R. 56.1 Stmt. ¶ 22; Collyer Decl., Ex. K)  One week later,

on April 24, 2007, Plaintiff chanted "Metrotech equals Virginia Tech" to his colleagues at

District Office 1 and referred to himself as "Cho," the shooter at Virginia Tech.[3]  (Def. R. 56.1

Stmt. ¶ 23; Collyer Decl., Exs. J at BITS0017-BITS0018 and L)  Plaintiff's supervisor at the

time, John Tuah, instructed him to stop his chanting, but Plaintiff refused.  (Def. R. 56.1 Stmt. ¶

24)  Tuah then reported Krasner's behavior to his supervisor.  (Def. R. 56.1 Stmt. ¶ 25; Collyer

Decl., Ex. L)  Fire marshals responded to the floor and revoked Plaintiff's security credentials,

requiring him to pass through metal detectors each morning.  (Def. R. 56.1 Stmt. ¶ 26)

Following this incident, Plaintiff was ordered to seek treatment from the FDNY

Counseling Services Unit.  (Pltf. R. 56.1 Stmt. ¶ 16)  Plaintiff saw FDNY counselor Michael

Goldman and attended sessions with FDNY psychiatrist Dr. Sarah Gleacher.  (Pltf. R. 56.1 Stmt.

¶ 17)  There is no evidence that the FDNY Counseling Services Unit reported any aspect of

Krasner's diagnosis and treatment to his supervisors.  There is likewise no evidence that Krasner

---

[3]  Plaintiff admits that his conduct was not appropriate but states that he was joking.  (Pltf. Resp.
to Def. R. 56.1. Stmt. ¶ 23)

engaged in additional acts of misconduct between April 24, 2007, and his termination on November 23, 2009.

     C.    **Krasner's Disciplinary Proceedings**

On April 30, 2007, Plaintiff was informally served with twelve disciplinary charges alleging disorderly or disruptive conduct, and conduct prejudicial to the good order and discipline of the FDNY.  (Def. R. 56.1 Stmt. ¶ 27; Collyer Decl., Ex. J)  The disciplinary charges relate to the February 14, 2006, February 16, 2006, and April 24, 2007 incidents discussed above.  (Collyer Decl., Ex. J)  Plaintiff acknowledged receipt of the charges on May 4, 2007.  (Id.)

     1.    **The "Step I" Disciplinary Hearing**

On February 25, 2009 – 22 months after Krasner had been given notice of informal disciplinary charges against him – he was presented with proposed formal disciplinary charges at a "Step I Disciplinary Hearing."  (Pltf. R. 56.1 Stmt. ¶ 21; Krasner Decl., ¶ 18)  The hearing appears to have been conducted by an FDNY "conference leader" or hearing officer.  (Krasner Decl., Ex. E) There is no explanation in the record for the delay between the initial presentation of charges and the Step I disciplinary hearing.[4]  Krasner had a union representative and was represented by counsel at the hearing.  (Krasner Decl., Ex. E)  In connection with the hearing, Krasner's attorney submitted a January 20, 2009 report from Dr. Gleacher.  (Id.; see also Krasner Decl., Ex. A)  The report states that Krasner has been under the care of Dr. Gleacher since August 2007, and that he

---

[4]  As discussed below, Krasner contends that formal proceedings were initiated against him in retaliation for his January 9 or 12, 2009 complaint to the FDNY's Office of Equal Employment Opportunity ("OEEO") and his request that same day – February 25, 2009 – for a reasonable accommodation.  (Pltf. Reply Br. (Dkt. 29) at 4)

suffers from Asperger's Disorder, and consequently exhibits severely impaired social skills. This leads to awkward incidents at work and results in his inability to develop and maintain relationships. However, his ability to function at a high level as an inspector is not affected. . . .

(Krasner Decl., Ex. A at 1, 4-5)

In her findings, the hearing officer states that she is "very sympathetic to the fact that Mr. Krasner suffers from a disorder that, by definition, means he will have difficulty navigating any workplace that requires social interaction. . . . Nevertheless, using profanity and being insubordinate and disruptive in the workplace is not acceptable. His colleagues and supervisors have been subjected to uncomfortable situations that cannot have been pleasant." (Krasner Decl., Ex. E at BITS0066) The FDNY's disciplinary counsel recommended a penalty consisting of the loss of ten days' pay, the loss of ten days of annual leave, and a 24-month probationary period. If Krasner committed similar misconduct, he would "be sanctioned with an automatic 30 day pay penalty." (Id. at BITS0067) The hearing officer states that she does "not oppose that recommendation." (Id.)

The FDNY sought Krasner's removal, however, and on June 25, 2009, Krasner was informed that a disciplinary proceeding would be conducted on July 21 and 22, 2009, before an Administrative Law Judge of New York City's Office of Administrative Trials and Hearings. (Krasner Decl., Ex. F)

### 2.   The Trial Before the ALJ

A trial before ALJ Ingrid Addison took place on July 21 and 22, 2009[5]  (Def. R. 56.1 Stmt. ¶ 28; Collyer Decl. Ex. F)  At the hearing, Plaintiff was represented by counsel, testified on his own behalf, was able to call and examine witnesses, cross-examine FDNY

---

[5]  This proceeding was conducted pursuant to Section 75 of the New York Civil Service Law. (Collyer Decl., Ex. F at 1)

witnesses, and offer documentary evidence.  (Def. R. 56.1 Stmt. ¶ 29)  In addition to Krasner,

Judge Addison heard testimony from William Dease and John Tuah, deputy chief inspectors,

both of whom supervised Krasner at District Office 1.  (Collyer Decl., Ex. F, at 4-6)

Dease and Tuah testified to the February 14 and 16, 2006 incidents discussed

above and Krasner's work performance in general.  (Collyer Decl., Ex. F, at 4-5)  Both men

testified that Krasner is "very bright, excels at his job, is very productive . . . can be relied on

because his work is extremely thorough[,] and . . . is extremely knowledgeable about fire safety

codes."  (Id. at 3)  Both Dease and Tuah noted that in recognition of his superior performance,

Krasner had received the "Inspector of the Year" award in 2006.  (Id.)  While Krasner had "long

demonstrated idiosyncratic behavior, such as singing, or yelling in his work area, with periodic

boisterous outbursts if he opposed a decision or an instruction," Dease and Tuah testified that

Krasner's behavior had "recently become threatening."  (Id.)

The ALJ concluded that "the evidence that [Krasner] refused [on February 14,

2006] to obey an order [to issue a repeat violation] is uncontroverted," noted that the Civilian

Code of Conduct "prohibits employees from refusing to perform duties," and concluded that

Krasner's "refusal to comply with [his supervisor's] order to issue a repeat violation . . .

constitutes misconduct."  (Id. at 7-9) The ALJ further noted that Krasner did not dispute having

addressed his supervisors with profanities on February 16.  (Id. at 9)  Judge Addison further

ruled that an employee who uses profanity, or is otherwise disrespectful and disruptive to his

supervisors, has committed misconduct violative of the Code of Conduct.  (Id. at 9-10)

As to the February 14 incident, Judge Addison concluded that Krasner "resorted

to expletives [that day], as Mr. Dease testified."  (Id. at 9)  Judge Addison found Dease and Tuah

more credible than Krasner, and concluded that on February 16, 2006, Krasner had in fact

threatened to shoot Dease and fellow supervisor Holbert Murray with "bird shot," threatened to

kill Dease and Murray, and "initiated some kind of physical contact with Mr. Murray," and

"engaged in a physical altercation with [him]."[6]  (Id. at 9-10)  Judge Addison ruled that

Krasner's "words and actions [on February 16, 2006] were impermissible misconduct" that

violated the Code of Conduct.  (Id. at 11)

       The ALJ also concluded that the FDNY had proved that on April 24, 2007,

Krasner "repeatedly chanted 'Metrotech equals Virginia Tech' and referred to himself as 'Cho,'

the gunman in the Virginia Tech. shootings."  (Id.)  In connection with this incident, Tuah

testified that while Krasner frequently engaged in inappropriate behavior and made inappropriate

statements – including maintaining a sign on his desk that read "going postal" – Tuah "had never

before felt threatened" by Krasner until the April 24, 2007 incident.  (Id.)

       When Tuah heard Krasner's chanting, he instructed him to stop, telling Krasner,

"'I don't see how you could be joking about somebody gunning down 32 people.'"  (Id. at 12)

Krasner refused to stop the chanting, however, stating that "'My own mother calls me Cho.'"

(Id. at 12) At trial, Krasner did not dispute Mr. Tuah's testimony concerning the events on April

24, 2007, but explained that he was upset by his supervisor's insistence that he obtain a

businessman's signature on an inspection survey form.  (Id. at 12-13)  Judge Addison found that

Krasner intended the chanting about Virginia Tech to be "a threat to his supervisor, or at least a

reminder of what could happen if he became enraged," and concluded that Krasner had

committed misconduct violative of the Code of Conduct in threatening his supervisor with

violence.  (Id. at 14)

---

[6]  In making her credibility finding, Judge Addison noted that Dease's account was supported by
a "contemporaneous, detailed e-mail on February 16, memorializing what had occurred on
February 14 and 16."  (Collyer Decl., Ex. F at 9)

In her "Findings and Conclusion," Judge Addison ruled that the FDNY had

1. established that [Krasner] used profane language and loudly refused to issue a repeat violation as directed by two supervisors on February 14, 2006, in violation of Chp. 1(3), (4), (5) & (6) of its Civilian Code of Conduct.

2. established that on February 16, 2006, [Krasner] yelled at and directed profanity at two supervisors, verbally threatened the supervisors, and engaged in a physical confrontation with one of those supervisors by bumping his chest against the supervisor's, in violation of Chp. 1(3), (4), & (5) of its Civilian Code of Conduct.

3. established that, on April 24, 2007, [Krasner] loudly repeated the words "Metrotech equals Virginia Tech," and referred to himself as the perpetrator of the massacre to intimidate his supervisors, in violation of Chp. 1(3) & (5) of its Civilian Code of Conduct.

(Collyer Decl., Ex. F. at 14-15)

Judge Addison recommended that Krasner's employment be terminated, noting that the FDNY had "tried progressive discipline with [Krasner]."  (Collyer Decl., Ex. F. at 18) Plaintiff had received disciplinary reprimands in 1996, 1997 and 2003, and received a disciplinary memorandum in 2004.  (Def. R. 56.1 Stmt. ¶ 33; Collyer Decl., Ex. F at 18-19) "Despite repeated warnings, [Krasner's] misconduct not only persisted but escalated":

[Krasner's] refusal to comply with his supervisor's order, his use of profanities to his supervisors, and his engagement in a physical altercation with his supervisor were compounded by his threatening language. . . .[Krasner's] Virginia Tech remarks were not isolated.  Nor were they uttered to achieve a particular goal. . . .Viewed in this light, and mindful of the serious threat to human lives suggested by [Krasner's] analogizing Virginia Tech to his workplace, I find termination to be appropriate.

(Collyer Decl., Ex. F at 18)  On November 20, 2009, the Commissioner adopted the ALJ's findings and conclusions, and Plaintiff's employment as a Fire Protection Inspector was terminated, effective November 23, 2009.  (Def. R. 56.1 Stmt. ¶ 34; Collyer Decl., Ex. M)

9

**D.    Krasner's Equal Employment Opportunity Complaint**

On January 12, 2009, prior to the Step I disciplinary hearing, Plaintiff complained to the FDNY Office of Equal Employment Opportunity ("OEEO") that his supervisor, Holbert Murray, was discriminating against him because he was not of a West Indian/Caribbean background.  (Def. R. 56.1 Stmt. ¶¶ 35-36)  The OEEO conducted an investigation and found Plaintiff's complaints unsubstantiated.  (Def. R. 56.1 Stmt. ¶ 37; Collyer Decl., Ex. N)

On February 25, 2009, Plaintiff submitted a written request for a reasonable accommodation, in which he asked that either he or Murray be transferred to a different office. (Def. R. 56.1 Stmt. ¶ 38; Collyer Decl., Ex. O)  Plaintiff stated that he suffers from "Adult Asperger's Disease/Syndrome," that the condition does not affect his ability to perform his duties, but that his condition leads to "awkward moments" with his supervisor Holbert Murray, "who possesses an abusive personality."   (Collyer Decl., Ex. O at RA0006)[7]  This was the first time Plaintiff disclosed to the FDNY that he had been diagnosed with Asperger's Syndrome. (Collyer Decl., Ex. E (Krasner. Dep.) at 68-69; Krasner Decl. ¶ 17, Ex. A)

On July 21, 2009, the OEEO called Plaintiff to discuss his reasonable accommodation request and spoke with Plaintiff's then attorney.  (Def. R. 56.1 Stmt. ¶ 40)  On September 8, 2009, Krasner's attorney requested that the OEEO take no action on Krasner's reasonable accommodation request until a final determination had been made in Plaintiff's disciplinary proceeding.  (Def. R. 56.1 Stmt. ¶ 41; Collyer Decl., Ex. P)  On September 17, 2009,

---

[7]  Section 299.80 of the Diagnostic and Statistical Manual of Mental Disorders describes "the essential features of Asperger's Disorder" as "severe and sustained impairments in social interaction."  The disorder causes "clinically significant impairment in social, occupational, or other important areas of functioning."  Asperger's Syndrome is continuous, lifelong, "severe and defined in the same way as Autistic Disorder."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, pp. 80-84.

OEEO sent a letter to Krasner's counsel confirming his request that OEEO take no action

concerning Krasner's request for a reasonable accommodation.[8]  (Collyer Decl., Ex. P)

On June 17, 2010, Plaintiff filed a complaint with the Equal Employment

Opportunity Commission.  (Def. R. 56.1 Stmt. ¶ 42; Collyer Decl., Ex. Q)  Plaintiff alleged:

> I was hired on 6-29-92 as a Fire Protection Inspector.  I maintained satisfactory work
> performance throughout my years there.  I was diagnosed with a disability in or around
> October 2007.  One of the characteristics of this disability causes me to make
> inappropriate statements or remarks.  Usually, on medication, this condition allows me to
> function and work without issue.  I filed for a reasonable accommodation in March 2009
> to be transferred out of the department, because my supervisor Holbert Murray was
> creating a hostile work environment for me, but no accommodation was given.  Because
> of one outburst (in the form of an inappropriate joke), I was terminated from my
> employment on 11-21-09.
>
> I believe I am being discriminated against in violation of the Americans with Disabilities
> Act of 1990, as amended.

(Collyer Decl., Ex. Q)

---

[8]  On September 17, 2009, Lyndelle T. Phillips, FDNY Assistant Commissioner – Equal
Employment Opportunity Office, sent a letter to Plaintiff's then attorney, Michael Galano,
stating the following:

> This is to confirm your conversation with the Fire Department's Equal
> Employment Opportunity (EEO) Office on Tuesday, September 8, 2009.
> At that time, the Fire Department was responding to a request made by
> your client . . . for a reasonable accommodation for a disability.
>
> This is to acknowledge that you asked EEO's Disability Unit to postpone
> Mr. Krasner's reasonable accommodation process pending a final
> determination in a related matter by the Bureau of Investigations and
> Trials (BITS).
>
> Therefore, pursuant to your request, at this time the EEO Office will not
> pursue Mr. Krasner's request for a reasonable accommodation for a
> disability.

(Collyer Decl., Ex. P)

E.     **Procedural History**

The EEOC issued a right-to-sue letter on December 14, 2010.  (Def. R. 56.1 Stmt.

¶ 43)  On March 8, 2011, this case was filed in the Supreme Court of the State of New York,

Bronx County.  (Dkt. No. 1)  Defendants removed this case to this Court on March 24, 2011.

(Dkt. No.1)  Plaintiff filed his Amended Complaint on July 27, 2011.  (Dkt. No. 7)  Krasner

moved for partial summary judgment on September 12, 2012 (Dkt. No. 26), and Defendants

cross-moved for summary judgment on September 24, 2012.  (Dkt. No. 33)

## DISCUSSION

Plaintiff argues that he is entitled to summary judgment on his claims brought

under the ADA, the NYSHRL, and the NYCHRL, because he "was terminated [in 2009] as a

result of two old incidents in 2006 and 2007 which are directly attributable to his disability."

(Pltf. Br. (Dkt. No. 26) at 5; Pltf. Reply Br. (Dkt. No. 29) at 3)

Defendants argue that they are entitled to summary judgment as to

(1)  Defendant FDNY, because the FDNY is not a suable entity;

(2)  claims based on alleged discriminatory acts that took place before August 21,
     2009, because such claims are barred by the 300-day statute of limitations;

(3)  disability discrimination claims, because Plaintiff was terminated based on
     repeated misconduct and not because of his alleged disability;

(4)  Plaintiff's reasonable accommodation claim, because he was never denied a
     reasonable accommodation; and

(5)  Plaintiff's retaliation claim, because there is no causal connection between
     Plaintiff's termination in November 2009 and Plaintiff's complaint to the
     OEEO in January 2009.

(Def. Br. (Dkt. No. 36))

## I.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor," <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008), and the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.'" <u>Abdu–Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) (quoting <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts. . . . [He] must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)).

The Court is mindful that "direct evidence of . . . [discriminatory] intent will only rarely be available, . . . [so] 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008) (quoting <u>Gallo v. Prudential Residential Servs., Ltd., P'Ship.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).  However, the Court must also "carefully distinguish between

evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

This Court will analyze Plaintiff's federal and state law disability claims together, because they are governed by the same legal framework. See Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.").

With respect to Plaintiff's NYCHRL claims, the Court acknowledges that the New York City Local Civil Rights Restoration Act "was enacted to ensure the liberal construction of the [NYCHRL] by requiring that all provisions . . . be construed broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Bennett v. Health Management Sys., Inc., 92 AD.3d 29, 34 (1st Dept. 2011) (citations and internal quotation marks omitted). A court analyzing an NYCHRL discrimination claim must be particularly mindful that the plaintiff's burden in stating a prima facie case is de minimis and that a defendant, on a motion for summary judgment, "bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the McDonnell-Douglas test, or as one of a number of mixed motives, by direct or circumstantial evidence." Id. at 35-41.

## II.     DEFENDANT FDNY IS NOT A SUABLE ENTITY

As an initial matter, all claims brought against the FDNY – a municipal agency – must be dismissed. The New York City Charter provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 17 § 396; accord Ximines v. George Wingate High Sch., 516 F.3d 156, 160 (2d Cir.

2008) (per curiam) (citing Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007)).

Accordingly, the FDNY is not a suable entity, and all claims against it are dismissed. See, e.g.,

United States v. City of New York, 683 F. Supp. 2d 225, 243 (E.D.N.Y. 2010) (citing Warheit v.

City of New York, No. 02 Civ. 7345 (PAC), 2006 WL 2381871, at *13 (S.D.N.Y. Aug. 15,

2006)) (dismissing all claims against FDNY because FDNY not suable); Petaway v. City of New

York, No. 02 Civ. 2715 (NGG) (LB), 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005)

(citations omitted) (same).

## III.   **APPLICATION OF 300-DAY STATUTE OF LIMITATIONS**

Defendants argue that

> any allegations of incidents of discrimination accruing prior to August 21, 2009, are
> barred by the 300-day statute of limitations.  Time-barred incidents in the complaint
> include the filing of disciplinary charges, the hearing of those charges, and the Report and
> Recommendation of an [ALJ] at [OATH] finding plaintiff guilty and recommending
> plaintiff's termination.  Only plaintiff's termination is within the statute of limitations
> period.

(Def. Br. (Dkt. No. 36) at 1-2)

In response, Plaintiff claims that the pre-termination events are not time-barred,

because he has brought a hostile work environment claim, and may take advantage of the

"continuing violation" theory of liability.  (Pltf. Opp. Br. (Dkt. No. 39) at 2)

Prior to commencement of ADA litigation, a plaintiff must file an administrative

complaint with the EEOC.  Such a complaint must be filed within 300 days of the alleged

discriminatory act.  42 U.S.C. § 12117(ADA); Forsyth v. Federation Employment and Guidance

Service, 409 F.3d 565, 572 (2d Cir. 2005); Flaherty v. Metromail Corp., 235 F.3d 133, 136 n.1

(2d Cir. 2000).  Failure to file an administrative charge with the EEOC within the 300 days

extinguishes the claim and prohibits recovery.  Butts v. New York Dep't of Hous. Preservation &

Dev., 990 F.2d 1397, 1401 (2d Cir. 1993).

15

However, "[a]n exception to this rule is provided by the continuing violation doctrine." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001).  Where a plaintiff experienced "a 'continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Id. (citing Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992) (quoting Miller v. International Telephone & Telegraph Corp., 755 F.2d 20, 25 (2d Cir. 1985)).  Where there is a continuous violation, a "Plaintiff's discriminatory . . . claim is timely because she filed her . . . charge within 300 days of an allegedly discriminatory" act in the series.  Brodrick v. City of New York, 942 F. Supp. 196, 199 (S.D.N.Y. 1996) (finding continuous violation for each payment made at discriminatory wage); Cf. Petrosino v. Bell Atlantic, 385 F.3d 210, 219-220 (2d Cir. 2004) ("Because [plaintiff] does point to some allegedly gender-hostile actions occurring [within 300 days of her complaint], the district court correctly found her hostile work environment claim timely and properly considered earlier events dating back [eight years] in support of this claim.").

The Amended Complaint does not explicitly reference a hostile work environment claim.  Plaintiff's initial complaint contained an allegation that "Plaintiff's supervisor created a hostile work environment. . . ." (Cmplt. (Dkt. No. 1) ¶ 6), but that allegation was dropped in the Amended Complaint.  (Dkt. No. 7)  Moreover, in the two briefs that Plaintiff filed in support of his motion for summary judgment, no mention is made of a hostile work environment claim. Instead, Plaintiff focuses solely on Plaintiff's termination, arguing that was the "result of two old incidents in 2006 and 2007 which are directly attributable to his disability."  (Pltf. Br. (Dkt. No. 27) at 5; Pltf. Reply Br. (Dkt. No. 29) at 3).  Plaintiff's first mention of a hostile work

environment claim is in his opposition to Defendant's summary judgment motion, and is made in response to Defendants' statute of limitations argument.  (Pltf. Opp. Br. (Dkt. No. 39) at 2-11)

Assuming <u>arguendo</u> that the Amended Complaint pleads a hostile work environment claim, Plaintiff has not proffered sufficient evidence – under the unusual circumstances of this case – to demonstrate that "the harassment [he suffered] was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'"  <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 356 (2d Cir. 2001) (quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993)).  In examining whether a hostile work environment existed, courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 154 (2d Cir. 2000) (quoting <u>Harris</u>, 510 U.S. at 23).

To the extent that Plaintiff is claiming that the charges associated with his conduct in February 2006 and April 2007 are evidence of a hostile work environment, the Court rejects that suggestion.  Given the factual record – including the findings made by the ALJ – the FDNY had ample grounds for bringing charges against Krasner.  Similarly, Plaintiff may not rely on Defendant's alleged failure to offer him a reasonable accommodation (<u>see</u> Pltf. Opp. Br. (Dkt. No. 39) at 8) as proof of a hostile work environment claim, because the Court concludes – as discussed below – that Krasner asked the FDNY not to take action on his reasonable accommodation request.  The Court further concludes that requiring Plaintiff to pass through a metal detector (<u>see id.</u> at 9) was a reasonable response to his threats in April 2007 and reference to the Virginia Tech shooting incident, and is not evidence demonstrating a hostile work environment.  As discussed below, the Court further concludes that the FDNY's decision to

terminate Plaintiff's employment was not an act of unlawful disability discrimination, but was instead a reasonable response to his threatening behavior. The remaining incidents cited by Plaintiff are disparate in time and nature and do not constitute "severe or pervasive" harassment sufficient "to alter the conditions of [Krasner's] employment." Fitzgerald, 251 F.3d at 356.

Krasner first cites an incident in September 2008 when he notified one supervisor that he was taking sick days, and Superviser Murray nonetheless marked him "AWOL." Krasner does not suggest that this error was not corrected or that he suffered any loss as a result. (Pltf. Opp. Br. (Dkt. No. 39) at 6)

In late October 2008, Plaintiff alleges that he was "written up for leaving the office later than 9:00 a.m. to go into the field. . . ." (Id.) Krasner again does not suggest that there were any consequences related to the "write up."

In December 2008, and on February 26, 2009, and April 27, 2009, Krasner claims that Murray yelled at him. (Id. at 7-9)

In February 2009, Plaintiff claims that he was "falsely written up for making a personal call at the office. . . ." (Id. at 8) Again, Krasner does not allege that he suffered any consequences as a result of the alleged "write-up."

These acts are not sufficient to demonstrate a hostile work environment or to justify application of the "continuing violation" theory of liability. See Salerno v Town of Bedford, NY, 72 Fed. R. Serv. 3d 240 (S.D.N.Y. 2008) (citing Weeks v. New York State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001)) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim.") Singh v. U.S. Sec. Associates, Inc., No. 03 Civ. 2059 (FM), 2005 WL 236511, at *11-12 (S.D.N.Y. Feb. 1, 2005) (fact that plaintiff was "fraudulently writ[ten] . . . up on two occasions" insufficient to establish a

hostile work environment), aff'd, 152 F. App'x 36 (2d Cir. 2005); White v. Fuji Photo Film USA,

Inc., 434 F. Supp. 2d 144, 155 (S.D.N.Y. 2006) (fact that manager "yell[ed] at Plaintiff"

insufficient to establish a hostile work environment); Mormol v. Costco Wholesale Corp., 364

F.3d 54, 57-58 (2d Cir. 2004) (hostile work environment not established where plaintiff was

"given a disciplinary notice, ostensibly for being five minutes late in returning from a break.").

       Accordingly, Plaintiff's claims are time-barred to the extent that they are based on

events that occurred more than 300 days before Krasner's June 17, 2010 EEOC complaint.

**IV.**    **DISABILTY DISCRIMINATION CLAIMS**

       The Plaintiff argues that he was terminated because he suffers from Asperger's

syndrome, (Pltf. Opp. Br. at 11; Pltf. Br. at 3), while Defendants claim that Plaintiff was fired

because of serious and escalating misconduct.  (Def. Br. at 4-5; Def. Opp. Br. at 4)

       The ADA prohibits "discriminat[ion] against a qualified individual on the basis of

disability in regard to[, inter alia,] . . . discharge of employees." 42 U.S.C. § 12112(a); see also

Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  Claims alleging disability

discrimination in violation of the ADA are subject to the burden-shifting analysis set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sista, 445 F.3d at 169.  "A

plaintiff must establish a prima facie case; the employer must offer through the introduction of

admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff

must then produce evidence and carry the burden of persuasion that the proffered reason is a

pretext."  Id.  Discrimination in violation of the ADA includes, inter alia, "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability."  42 U.S.C. § 12112(b)(5)(A); see also Brady v. Wal-Mart Stores, Inc., 531

F.3d 127, 134 (2d Cir. 2008).  In addition, for the purposes of the ADA, a "qualified individual"

is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

### A.    Prima Facie Case

"To establish a prima facie case of discrimination under the ADA, plaintiff must show by a preponderance of the evidence that

(1) his employer is subject to the ADA;

(2) he was disabled within the meaning of the ADA;

(3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and

(4) he suffered [an] adverse employment action because of his disability."

Heyman v Queens Vil. Comm. for Mental Health for Jamaica Community Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999) (citing Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 70 (2d Cir. 1998)).

Here, Defendants do not dispute that the FDNY is subject to the ADA; that Krasner is disabled within the meaning of the ADA; and that Krasner suffered an adverse employment action.  Defendants contend, instead, that Krasner has not demonstrated that he was "otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation."  (Def. Br. at 4-5)  Defendants further contend that Plaintiff's disciplinary history, including acts of serious insubordination, use of foul language, and threats to co-workers rendered Krasner not qualified.[9]  (Id. at 5; see also Collyer Decl., Exs. F-J, L, M)  Plaintiff does

---

[9]  ALJ Addison's factual findings concerning these matters are entitled to preclusive effect here. "Absent specific statutory guidance from Congress, the preclusive effect of prior unreviewed state administrative determinations upon a subsequent suit in federal court is a matter of federal common law."  Leventhal v Knapek, 266 F.3d 64, 71-72 (2d Cir. 2001) (citing Univ. of Tenn. v. Elliott, 478 U.S. 788, 796-99 (1986) (fashioning common law rules for issue preclusion in suit

not dispute his disciplinary history, but argues that these acts were caused by his disability –

Asperger's syndrome – and therefore provide no justification for his termination.

        "A disabled individual is not 'otherwise qualified' for a particular employment

position if such individual poses a 'direct threat' to the health or safety of others which cannot be

eliminated by a reasonable accommodation."  Adams v. Rochester Gen. Hosp., 977 F. Supp. 226,

---

under 42 U.S.C. § 1983).  "When federal common law gives preclusive effect in federal court to
a state administrative determination, that prior determination has 'the same preclusive effect to
which it would be entitled in the State's courts.'"  Leventhal, 266 F.3d at 72 (quoting Elliot, 478
U.S. at 799.))  Accordingly, "when a state agency 'acting in a judicial capacity . . . resolves
disputed issues of fact properly before it which the parties have had an adequate opportunity to
litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it
would be entitled in the State's courts." Elliot, 478 U.S. at 799 (citing United States v. Utah
Construction & Mining Co., 384 U.S. 394, 422 (1966)).

    The requirements for issue preclusion (collateral estoppel) are that:  (1) identical issues have
been decided in the prior action; (2) the issues will be decisive in the present action; and (3) the
party to be precluded from re-litigating the issues had a full and fair opportunity to contest the
prior determination.  See Doe v. Pfrommer, 148 F.3d 73, 79 (2d Cir. 1998).  In addition, "[w]hen
the doctrine of collateral estoppel is . . . applied to the determinations of administrative agencies,
New York courts [ ] require the agency's determination be 'quasi-judicial' in character rather
than legislative."  Dudzik v. City of New York, No. 01 Civ. 2450, 2003 WL 203226, at *8 n.11
(S.D.N.Y. Jan. 29, 2003) (quoting Long Island Lighting Co. v. Imo Industries, Inc., 6 F.3d 876,
885 (2d Cir. 1993))

    Here, factual issues regarding Plaintiff's prior acts of misconduct were raised and decided
during the administrative proceeding.  As discussed below, the facts found by Judge Addison are
decisive here.  Moreover, the proceeding before ALJ Addison was clearly quasi-judicial, rather
than legislative, in nature.  See Collyer Decl., Ex. F.

    With respect to the fairness of the trial before Judge Addison, it is undisputed that Plaintiff
was represented by counsel, testified on his own behalf, was able to call and examine witnesses,
cross-examined FDNY witnesses, and offered documentary evidence.  (Def. R. 56.1 Stmt. ¶ 29)

    Because Krasner had a full and fair opportunity to contest the FDNY's disciplinary charges
during his trial before the ALJ, that proceeding "comported with the issue preclusion
requirements under New York law."  Accordingly, ALJ Addison's "findings of fact are
preclusive in this action."  See Dudzik, 2003 WL at *8; see also Harrison v. Arlington Cent. Sch.
Dist., 60 F. Supp. 2d 186, 190 (S.D.N.Y. 1999) (concluding, after review of transcript from Civil
Service, Section 75 hearing, that the "plaintiff was afforded all the rights necessary to give that
determination preclusive effect.").

233-34 (W.D.N.Y. 1997) (quoting Altman v. New York City Health and Hospitals Corp., 903 F. Supp. 503 (S.D.N.Y. 1995), aff'd, 100 F.3d 1054 (2d Cir. 1996); see id. ("Where the record demonstrates that an employee poses a significant risk to the health and safety of others which cannot be eliminated by reasonable accommodation, summary judgment in favor of the employer is appropriate."); see also E.E.O.C. v. Amego, Inc., 110 F.3d 135 (1st Cir. 1997) (affirming summary judgment against employee who suffered from depression and therefore was unqualified to perform job that required administering and monitoring medication for severely disabled residents of group home); Doe v. University of Maryland Medical System Corp., 50 F.3d 1261 (4th Cir. 1995) (neurosurgery resident who tested positive for HIV was not an otherwise qualified individual with a disability; summary judgment order affirmed); F.F. v. City of Laredo, 912 F. Supp. 248 (S.D. Tex. 1995) (summary judgment granted against bus driver who suffered from bi-polar mental disorder because his handicap posed a significant safety risk and therefore he was not "otherwise qualified" for job).  A "direct threat" is a "significant risk of substantial harm to the health or safety of the individual or others."  29 C.F.R. § 1630.2(r).

Plaintiff bears the burden of proving he is "otherwise qualified" for his job, Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 137-38 (2d Cir. 1995), and here Krasner has not met that burden.  It is undisputed that Krasner repeatedly engaged in serious misconduct, including threatening co-workers with serious harm.  (Def. R. 56.1 Stmt. ¶¶ 13-18, 20; see also Collyer Decl., Ex. F)  While Krasner attributes his misconduct to Asperger's syndrome, the law does not require an employer to tolerate misconduct simply because an employee is suffering from a disability.  See Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 288-89 (S.D.N.Y. 1999).

Indeed, whether Krasner's misconduct is a manifestation of his disability is immaterial, because the ADA does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace. See Johnson v. St. Clare's Hosp. & Health Ctr., No. 96 Civ. 1425 (MBM), 1998 WL 213203, at *7 (S.D.N.Y. April 30, 1998) ("Federal law does not require an employer to tolerate misconduct . . . merely because the employee is a recovering alcoholic or suffers from another disability"); Brennan v. New York City Police Dep't, No. 93 Civ. 8461 (BSJ), 1997 WL 811543, at *5 (S.D.N.Y. May 27, 1997) ("termination in the context of misconduct that is tied or related to alcoholism does not violate the ADA"), aff'd, 141 F.3d 1151 (2d Cir. 1998); Husowitz v. Runyon, 942 F. Supp. 822, 834 (E.D.N.Y.1996) (judgment for employer based on evidence that plaintiff, diagnosed with bipolar affective disorder, was uncooperative, disruptive, and "engaged in threatening conduct with his co-workers"); Francis v. Runyon, 928 F. Supp. 195, 205 (E.D.N.Y. 1996) ("[a] disabled individual cannot be 'otherwise qualified' for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute"); Misek–Falkoff v. Int'l Bus. Machs. Corp., 854 F. Supp. 245, 227 (S.D.N.Y. 1994) ("the employer may also require that employees, whether handicapped or not, not cause, or contribute to, undue interruptions and hostility in the workplace"); see also Hamilton v. Southerwestern Bell Tel. Co., 136 F.3d 1047, 1052 (5th Cir. 1998) ("the ADA does not insulate emotional or violent outbursts blamed on an impairment" and "[a]n employee who is fired because of outbursts at work directed at fellow employees has no ADA claim"); Palmer v. Circuit Court of Cook County, Ill., 117 F.3d 351, 352 (7th Cir. 1997) ("if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the [ADA]"); Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997)

("misconduct – even misconduct related to a disability – is not itself a disability, and an employer is free to fire an employee on that basis"); <u>Williams v. Widnall</u>, 79 F.3d 1003, 1006 (10th Cir. 1996) (affirming summary judgment for employer where alcoholic employee was discharged for threatening colleagues); <u>Breiland v. Advance Circuits, Inc.</u>, 976 F. Supp. 858, 865 (D. Minn. 1997) (granting summary judgment for employer where plaintiff violated workplace policies; employer is not obligated by the ADA "to ignore plaintiff's misconduct"); <u>Shiflett v. GE Fanuc Automation Corp.</u>, 960 F. Supp. 1022, 1029-30 (W.D. Va. 1997) (granting summary judgment to employer where employee harassed and intimidated colleague), <u>aff'd</u>, 151 F.3d 1030 (4th Cir. 1998); <u>Schutts v. Bentley Nevada Corp.</u>, 966 F. Supp. 1549, 1555 (D. Nev. 1997) ("[a]n employee who commits an act of misconduct may be fired, whether he or she is disabled within the meaning of the ADA, or an astronaut or Olympic athlete. . . . [S]tatutes which bar discrimination do not insulate disabled employees from discharge for acts for which a non-disabled employee could certainly be fired."). "The [ADA] protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one." <u>Palmer</u>, 117 F.3d at 352-53.

       This same analysis applies to disability discrimination claims brought under the NYSHRL and the NYCHRL.  <u>See</u> <u>Hazen v. Hill Betts & Nash LLP</u>, 92 A.D.3d 162, 170 (1st Dept. 2012) ("Well-established precedent demonstrates that the New York State Human Rights Law does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace."); <u>Cuttler v. Friedm Frank, Harris, Shriver & Jacobson, LLP</u>, No. 10 Civ. 296 (DAB), 2012 WL 1003511, at *6 (S.D.N.Y March 23, 2012) ("Unfortunately for Plaintiff, the NYSHRL and NYCHRL do not require Defendant to excuse her admitted workplace misconduct as an accommodation of her disability.").

In light of Plaintiff's failure to establish a prima facie case of discrimination, the Court need not reach the remainder of the three-part analysis.  See Quintana v. Sound Distrib Corp., No. 95 Civ. 0309 (LAP), 1997 WL 40866, at *7 (S.D.N.Y. Feb. 3, 1997) ("[o]nly once plaintiff has established a prima facie case of discrimination does the burden of production shift to defendant to demonstrate a legitimate and non-discriminatory reason for employee's discharge.").  Although caution in granting a motion for summary judgment is in order when issues of intent and state of mind are in question, "[t]he summary judgment rule would be rendered sterile . . .  if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Viewing the instant record in the light most favorable to Plaintiff, no rational jury – with knowledge of the law – could find either that he was "otherwise qualified" to perform the essential functions of his job or that the FDNY's actions in terminating him were motivated by discrimination.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims of discriminatory discharge under the ADA, the NYSHRL, and the NYCHRL.

## V.      KRASNER WAS NOT DENIED A REASONABLE ACCOMMODATION

Plaintiff also contends that Defendants are liable for disability discrimination on a failure to accommodate theory.

To make out a prima facie case of disability discrimination arising out of a failure to accommodate, plaintiff must demonstrate that

(1) [P]laintiff is a person with a disability under the meaning of the ADA;

(2) an employer covered by the statute had notice of his disability;

(3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and

(4) the employer has refused to make such accommodations.

Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006) (quoting Rodal v.

Anesthesia Group of Onondaga, P. C., 369 F.3d 113, 118 (2d Cir. 2004)) (internal quotation

mark omitted).

   Here, Krasner has not met his burden.  It is undisputed that (1) on February 25,

2009, Krasner submitted a written request for a reasonable accommodation, requesting that either

he or Murray, his supervisor, be transferred to a different office (Def. R. 56.1 Stmt. ¶ 38; Collyer

Decl., Ex. O); (2) on July 21, 2009, the OEEO called Krasner to discuss his request and spoke

with Plaintiff's then attorney (Def. R. 56.1 Stmt. ¶ 40); and (3) on September 8, 2009, Plaintiff

requested that action on his reasonable accommodation request be postponed until the resolution

of his disciplinary proceeding.  (Def. R. 56.1 Stmt. ¶41; Collyer Decl., Ex. P)  "An employee

seeking an accommodation is obliged to participate in [an] interactive process [with the

employer] in order to help the employer identify the '"precise limitations resulting from the

disability and potential reasonable accommodations that could overcome those limitations.'"

Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) (citing 29

C.F.R. § 1630.2(o)(3)).  There was no interactive process here, because Plaintiff asked the

FDNY not to take action on his reasonable accommodation request.

   Having sought and obtained Defendant's consent to postponing action on

Plaintiff's reasonable accommodation request, Plaintiff cannot claim that Defendant's failure to

offer him a reasonable accommodation constitutes disability discrimination.[10]

---

[10]  Even absent his postponement request, Krasner has not made out a prima facie case on failure
to accommodate.  He has not offered evidence that there was a position available, with like terms
and conditions of employment.  See, e.g., Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562,
566 (2d Cir. 2000); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999).

Defendants are entitled to summary judgment on Plaintiff's disability discrimination claims to the extent they are premised on a failure to accommodate claim theory.

## VI.   KRASNER'S RETALIATION CLAIM

The ADA prohibits retaliation against any individual who asserts rights under the ADA.  Sarno v. Douglas Elliman–Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999); see also 42 U.S.C. § 12203(a).  This prohibition protects individuals from retaliation when they, inter alia, seek a reasonable accommodation for their disability.  See Weixel v. Board of Educ. of City of New York, 287 F.3d. 138, 148 (2d Cir. 2002).  "Claims for retaliation [under both the ADA and the Rehabilitation Act] are analyzed under the same burden-shifting framework established for Title VII cases."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

As with primary discrimination claims, once a prima facie retaliation case has been established, the burden shifts to the defendant, which must then assert a non-discriminatory reason for an adverse action.  Kessler v. Westchester Dept. of Social Services, 461 F.3d 199, 205-06 (2d, Cir. 2006).  Where the defendant meets this burden, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is pretextual.  Kessler, 461 F.3d at 205-06.

### A.   Prima Facie Case

> In order to establish a prima facie case of retaliation, [Plaintiff] must show that:  (1) he engaged in an activity protected by the ADA [or the Rehabilitation Act]; (2) [Defendants were] aware of this activity; (3) [Defendants] took adverse . . . action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.

Treglia, 313 F.3d at 719.  "A plaintiff's burden at this prima facie stage is de minimis."  Id.

In the context of a retaliation claim, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of

discrimination.'"  <u>Burlington Northern and Sante Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006);

<u>see</u> <u>also</u> <u>Welch v. United Parcel Service, Inc.</u>, 871 F. Supp. 2d 164, 182 (E.D.N.Y. 2012) ("An

action is deemed 'adverse' within the meaning of the ADA if it is the type of action that 'could

well dissuade' a reasonable person from making or supporting a charge of discrimination.")

   It is well-established that a "plaintiff may prevail on a claim for retaliation even

when the underlying conduct complained of was not in fact unlawful so long as he can establish

that he possessed a good faith, reasonable belief that the underlying challenged actions of the

employer violated [the] law."  <u>Treulia</u>, 313 F.3d at 719 (internal quotation marks omitted).  The

law protects employees in the filing of formal charges of discrimination as well as in the making

of informal protests of discrimination, including complaints to management.  <u>See</u> <u>Sumner v. U.S.</u>

<u>Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990); <u>see</u> <u>also</u> <u>Shepheard</u>, 360 Fed. App'x at 251 (2d

Cir. 2010) (addressing ADA retaliation).

### B.  <u>Krasner's Alleged Protected Activity</u>

   Krasner claims he engaged in [protected] activity on two occasions.  (Pltf. Opp.

Br. (Dkt. No. 39) at 19)  According to Krasner, on January 9, 2009, he called the FDNY's EEO

unit "to report an outburst by examiner Murray against Plaintiff based on his disability."  (<u>Id.</u>)

As support for this assertion, Krasner cites to his declaration, at Paragraph 16.  The declaration

contains the same conclusory statement, and provides no additional information concerning this

alleged report, which is not referenced in Plaintiff's Local Rule 56.1 statement.  Because

Plaintiff provides no evidentiary support for this assertion, it will be disregarded.[11]

---

[11] There is evidence that Krasner complained to the EEO office on January 12, 2009, that Murray "discriminates against everyone who does not have a West Indian/Caribbean background." (Collyer Decl., Ex. N)  Plaintiff has cited no evidence demonstrating that his January 12, 2009 complaint involved his disability.   Krasner's complaint was investigated and found to be unsubstantiated.  (<u>Id.</u>)

Plaintiff also alleges that he engaged in protected activity on February 25, 2009, when he submitted a form to the FDNY's OEEO requesting an accommodation due to his disability.  (Pltf. Opp. Br. (Dkt. No. 39) at 19; Krasner Decl. ¶ 17, Ex. D)  The requested accommodation was that either Plaintiff or Murray be transferred to another FDNY office.  (Krasner Decl., Ex. D)  As to adverse employment action, Plaintiff cites to his termination on November 23, 2009.  (Pltf. Opp. Br. (Dkt. No. 39) at 19)  Plaintiff also contends that he suffered an adverse action on February 25, 2009, when the FDNY presented him with proposed disciplinary charges at the "Step I" disciplinary hearing.  (Pltf. Opp. Br. (Dkt. No. 39) at 20)  Plaintiff argues that this event took place close in time to the January 9, 2009 call he allegedly made to EEO to complain about Murray.  (Id.)  Defendants respond that the disciplinary charges Krasner was served with at the February 25, 2009 hearing were first served on him in April 2007.  (Def. Br. (Dkt. No. 36) at 9; Def. Reply Br. (Dkt. No. 40) at 9; see Def. R. 56.1 Stmt. ¶ 27)

C.   **Analysis**

Defendants do not dispute that Krasner engaged in a protected activity; that the FDNY knew about the protected activity; and that Krasner suffered an adverse employment action.  Defendants nonetheless argue that Krasner has not established a prima facie case of retaliation, because "there is no causal connection . . . between plaintiff['s] alleged protected activity . . . and his termination."  (Def. Br. 9)

"A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'"  Elhanafy v. Shinseki, No. 10 Civ.

3192 (JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting <u>Ashok v. Barnhart</u>, 289

F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (quoting <u>McNair v. New York City Health and Hosps.</u>

<u>Corp.</u>, 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001))); <u>see also</u> <u>Beaumont</u>, 2012 WL 1158802, at *6

("[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by

'showing that the protected activity was closely followed in time by the adverse [employment]

action.'") (quoting <u>Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.</u>, 252 F.3d

545, 554 (2d Cir. 2001) (quoting <u>Reed v. A.W. Lawrence & Co.</u>, 95 F.3d 1170, 1178 (2d Cir.

1996))).

   Here, there is no direct evidence of retaliatory animus, nor has Krasner offered

evidence that he was treated differently than similarly situated FPI's at the FDNY.  Accordingly,

Krasner's retaliation claim can succeed only if the alleged retaliatory action occurred close in

time to his protected activity.

   "Mere temporal proximity between a plaintiff's protected activity and an adverse

employment action is sufficient to create an inference of retaliation for purposes of proving a

<u>prima</u> <u>facie</u> case." <u>Aka v. Jacob K. Javits Convention Ctr. of New York</u>, No. 09 Civ. 8195 (FM),

2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (citing <u>El Sayed v. Hilton Hotels Corp.</u>, 627

F.3d 931, 932-33 (2d Cir. 2010); <u>Simpson v. N.Y. State Dep't of Civil Serv.</u>, 166 F. App'x 499,

502 (2d Cir. 2006)); <u>see also</u> <u>Pinkard v. New York City Dep't of Educ.</u>, No. 11 Civ. 5540 (FM),

2012 WL 1592520, at *6 (S.D.N.Y. May 2, 2012) ("[M]ere temporal proximity between a

plaintiff's protected activity and an adverse employment action may, by itself, be sufficient to

create an inference of retaliation for purposes of proving a <u>prima</u> <u>facie</u> case.") (citing <u>El Sayed</u>,

627 F.3d at 932) ("By demonstrating temporal proximity between his complaint and his

discharge, [plaintiff] arguably established a <u>prima</u> <u>facie</u> case of retaliation under Title VII.");

Demaio v. Connecticut Dep't of Corr., No. 3:09 Civ. 2133 (WWE), 2012 WL 892933, at *9 (D.

Conn. Mar. 15, 2012) ("Finally, because less than a month elapsed between the Plaintiff's

protected activity and the initiation of the March 2005, December 2007, and July 2008

investigations, the temporal proximity of the potentially adverse action to the protected activity

permits an inference of causation sufficient to make out a prima facie case of retaliation."); Bind

v. City of New York, No. 08 Civ. 11105 (RJH), 2011 WL 4542897, at *17 (S.D.N.Y. Sept. 30,

2011) ("Close temporal proximity between the plaintiff's protected action and the employer's

adverse employment action may in itself be sufficient to establish the requisite causal

connection.") (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010)).

        "In order for temporal proximity to establish causality, [however,] the intervening

period must be 'very close.'" Elhanafy, 2012 WL 2122178, at *17 (quoting Clark Cnty. Sch.

Dist. v. Breeden, 532 U.S. 268, 272 (2001)).  The Second Circuit has "not drawn a bright line

defining, for the purposes of a prima facie case, the outer limits beyond which a temporal

relationship is too attenuated to establish causation, [but it has held in at least one case] that five

months is not too long to find the causal relationship."  Gorzynski, 596 F.3d at 110.

        Here, the Court concludes that Krasner has not demonstrated a causal connection

between his January and February 2009 protected activity and his November 23, 2009

termination.  The nine-month gap is too long a time period for the Court to find an inference of

retaliatory animus.  See Elhanafy, 2012 WL 2122178, at *17; see also Clark County Sch. Dist.,

532 U.S. 268, 273 (2001) (citing with approval cases dismissing retaliation claims where there

were three and four month periods between protected activity and adverse employment action,

noting that temporal proximity must be "very close."); Ashok v. Barnhart,  289 F. Supp. 2d 305,

314 (E.D.N.Y. 2003) (citing, inter alia, Hollander v. American Cyanamid Co., 895 F.2d 80, 85-

86 (2d Cir. 1990) (no causal connection where three months passed between EEOC complaint and alleged adverse employment action)); Admassu v. Fox/Lorber Assocs., Inc., No. 99 Civ. 2665 (GBD), 2003 WL 22290226 at *6 (S.D.N.Y. Oct. 6. 2003) (allegedly retaliatory emails sent six months after plaintiff filed her EEOC complaint were "simply too far removed temporally from the filing of the EEOC complaint to raise an inference of retaliation"); Khan v. Abercrombie & Fitch, Inc., No. 01 Civ. 6163 (WHP), 2003 WL 22149527 at *9 (S.D.N.Y. Sept. 17, 2003) ("[T]he five-month gap between her . . . addition to her . . . NYCCHR complaint and her termination, combined with the absence of other evidence, are too great to infer a causal connection."); Lewis v. Snow, No. 01 Civ. 7785 (CBM), 2003 WL 22077457, at *8 (S.D.N.Y. Sept. 8, 2003) ("Plaintiff fails to make a showing of protected activity which was 'followed closely by' the alleged retaliatory treatment" where there was a more than three-month gap between them.); Rinsler v. Sony Pictures Entm't, Inc., 02 Civ. 4096, 2003 WL 22015434 at *9 (S.D.N.Y. Aug. 25, 2003) ("The almost six-month lag between [the protected activity] and the alleged retaliatory termination . . . is too temporally remote to support a retaliation claim.") (citing cases); Stuevecke v. New York Hosp. Med. Ctr., No. 01–CV–326, 2003 WL 22019073 at *5 (E.D.N.Y. Aug. 26, 2003) (protected activity and termination "occurred more than five months apart – a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity."); Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 315-16 (S.D.N.Y. June 10, 2003) ("The four-month interval between the Plaintiff's [protected activity] in April 1999 and his termination in July 1999 is insufficient evidence of a causal connection. . . . In fact, courts have repeatedly held that a four-month interval does not establish a causal connection for the purposes of a retaliation claim.")

The gap between Plaintiff's alleged January 9 or 12, 2009 complaint to the FDNY's OEEO and the February 25, 2009 hearing where he was presented with disciplinary charges is much narrower, and well within the time periods in which the Second Circuit has found an inference of retaliatory animus.[12] See, e.g., Gorman–Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) ("This temporal proximity is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion.  We are particularly confident that five months is not too long. . . .").  A claim regarding the February 25, 2009 presentation of charges would be time-barred, however, because it concerns conduct that took place well more than 300 days before Plaintiff filed his June 17, 2010 EEOC complaint.

Even if a retaliation claim regarding the February 25, 2009 presentation of charges were not time-barred, temporal proximity does not invariably permit an inference of retaliatory animus.  Such an inference does not arise, for example, where the adverse employment action is part of a lengthy process of performance management or progressive discipline.

In Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001), the Second Circuit noted that "the adverse employment actions were both part, and the ultimate product of, 'an extensive period of progressive discipline' which began when [the employer] diminished [the employee]'s job responsibilities a full five months prior to his filing of the EEOC charges."  The court ruled that "[w]here timing is the only basis for a claim of retaliation,

---

[12]  To the extent that Plaintiff suggests that the February 25, 2009 Step I disciplinary hearing and presentation of charges was retaliation for his February 25, 2009 request for a reasonable accommodation, that claim is inherently incredible.  The disciplinary hearing was attended by Krasner, his union representative, his lawyer, a lawyer for the FDNY, and a "conference leader". (Krasner Decl., Ex. E)  It is a fair inference that the hearing was scheduled in advance of the day it occurred.

and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Id. at 95.

Slattery applies here.  It is undisputed that the twelve charges presented to Plaintiff on April 30, 2007 (Collyer Decl., Ex. J (April 30, 2007 "Charges for Violations of Regulations") are the same twelve charges that were presented to him at the February 25, 2009 hearing (Krasner Decl., Ex. E (Step I Disciplinary Hearing Memorandum)), and that these same twelve charges were later the subject of the trial before the ALJ and of the ALJ's decision (Collyer Decl., Ex. F (ALJ Decision)), and of the Commissioner's December November 20, 2009 decision terminating Plaintiff's FDNY employment.  (Collyer Decl., Ex. M (Commissioner's Decision))  The February 25, 2009 presentation of charges was part of "an extensive period of progressive discipline."  Slattery, 248 F.3d at 95.  The FDNY's disciplinary proceedings against Plaintiff began on April 30, 2007, however, long before Plaintiff first engaged in protected activity on January 9 or 12, 2009.  Where, as here, "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Slattery, 248 F.3d at 95.

Plaintiff argues, however, that the FDNY allowed 22 months to pass between the initial presentation of charges to Krasner on April 30, 2007, and the presentation of charges at the Step I disciplinary hearing on February 25, 2009.  (Pltf. Opp. Br. (Dkt. No. 39) at 20)  Plaintiff suggests that the FDNY did not decide to go forward until Krasner made a call to the FDNY's OEEO office in early January 2009.  (Id.)  The problem with Plaintiff's argument is that there is no evidence in the record as to whether the 22-month gap is typical for the FDNY's internal discipline hearing system, or unusual.  Absent evidence that the FDNY had decided not

34

to pursue the April 30, 2007 charges, and changed course only after Krasner complained to the OEEO office about Murray, the <u>Slattery</u> rule applies.

Because Krasner has not presented evidence that raises an inference of retaliatory animus, he has not made out a <u>prima facie</u> case of retaliation.[13]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 26, 33) and to close this case.

Dated: New York, New York
           September 23, 2013

                                  SO ORDERED.

                                  _Paul G. Gardephe_
                                  Paul G. Gardephe
                                  United States District Judge

---

[13] Even if Krasner had made out a <u>prima facie</u> case, his retaliation claim would fail, because Defendants have demonstrated legitimate, non-discriminatory reasons for their actions. Based on the record before the ALJ – as well as the undisputed facts here – there is overwhelming evidence that Krasner repeatedly engaged in serious and disturbing misconduct, including threatening co-workers with serious harm. (<u>See</u>, <u>e.g.</u>, Def. R. 56.1 Stmt. ¶¶ 13-18, 20; <u>see also</u> Collyer Decl., Ex. F) No reasonable jury could conclude that the adverse actions taken against him were motivated by retaliatory animus, as opposed to a determination that he presented a risk of harm to his colleagues.